IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MARY E. CANNING, | ) | Case No. 4:18 cv-03023 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | DECLARATION OF |
| v. | ) | ERICA K. CICHOWSKI |
| | ) | IN SUPPORT OF |
| CREIGHTON UNIVERSITY, | ) | CREIGHTON UNIVERSITY'S |
| | ) | MOTION FOR |
| Defendant. | ) | SUMMARY JUDGMENT |

I, Erica K. Cichowski, make this Declaration in lieu of an affidavit as permitted by 28 U.S.C. § 1746. I am aware that this Declaration will be filed in the United States District Court for the District of Nebraska and that it is the legal equivalent of a statement under oath. I hereby state as follows:

1.    I am over the age of 18 and competent in all respects to make this Declaration. The facts contained herein are based upon my personal knowledge.

2.    I am a resident of Papillion, Nebraska and am a licensed physician who is board-certified in Internal Medicine. I am currently employed by the United States Veterans Administration as a primary care physician in the academic clinic at the Omaha VA Medical Center.

3.    I have also been employed by Creighton University as an assistant professor in the College of Medicine from July 2012 to the present.

4.    Creighton University is a private university located in Omaha, Nebraska. Creighton University has a College of Medicine which offers a Graduate Medical Education Program in Internal Medicine ("IM Program"). From February 2016 until June 2018, I was the Program Director of the IM Program.

1

5.     The IM Program is a three-year program, in which physicians progress through their residency and become qualified as specialists in Internal Medicine.  While participating in this program, the physicians are known as "medical residents" or simply "residents" and are Creighton employees.

6.     Physicians who are residents in the IM Program train under the supervision of physicians at various hospitals and clinics, which have affiliation agreements with the University.  The medical resident's job duty is to provide patient care in a developing process, in which they apprentice under faculty physicians and more senior residents in an apprenticeship model.  The apprenticeship model is set up so that medical residents can work progressively towards full autonomy by the time they finish their residency.  A medical resident's progress is measured through competencies defined by the accreditation body for residency training, the Accreditation Council for Graduate Medical Education ("ACGME").

7.     Medical residents must build on their medical knowledge and skills from medical school through study and experience, learning to evaluate and manage patients under direct supervision, seeing how the health care system functions, working with various health care disciplines, growing in professionalism by accepting feedback, and developing good communication with patients.  A medical resident is expected to grow consistently in all of these competencies throughout their three years, reaching higher levels of responsibility and independence in providing care to patients.

8.     Medical residents in the IM Program rotate with different medical specialties to gain broad experience in a variety of specialties. These rotations expose residents to many different evaluating faculty. Medical residents are evaluated frequently, with evaluations being conducted primarily by faculty physicians and their residents. Medical residents in the IM Program are usually evaluated every four weeks.

9.     Resident evaluations measure performance using objective milestones established by the ACGME for each specialty. These outcome-based milestones for resident performance are within six domains of clinical competence. The milestones are competency-based outcome expectations that must be demonstrated progressively by residents from the beginning of their education and culminate in their graduation to the unsupervised practice of their specialty. Each evaluation rates a resident on the milestones for each competency, and residents are expected to perform at a level consistent with the year of training that they have completed.

10.     The IM Program has a Clinical Competency Committee ("CCC"), which is responsible for overseeing the evaluation of the Program's residents' progression within the AGCME milestones. I served on the CCC throughout the period that Mary E. Canning was a resident in the IM Program, from July 1, 2015, until January 3, 2017, and I was the Program Director of the IM Program from February 2016 through her termination from the program.     During the 2015-16 program year, the other CCC members were: Brad DeVrieze, M.D., Chair; Tammy Wichman, M.D.; John Hurley, M.D.; Theresa Townley, M.D.;

3

Mahmoud Abu Hazeem, M.D.; Khalid Bashir, M.D.; Carrie Valenta, M.D., and Sunil Jagadesh, M.D.

11. From the start of her residency, Dr. Canning failed to perform up to expectations. In July 2015, she took a national exam, the IM-ITE®, which is administered to all incoming medical residents to assess their level of preparation and identify areas in which they have knowledge gaps when compared to their peers. Dr. Canning scored in the lowest 15% in the country on the initial ITE exam.

12. Throughout her time at Creighton, Dr. Canning's supervising faculty and residents reported having to devote extra effort while working with her to prevent her from committing serious medical errors on the patients who whom she was assigned. Dr. Canning also had difficulty self-assessing her own knowledge gaps, preventing her from seeking help because she did not know that she was beyond the scope of her limited medical knowledge. She continued to require much more assistance and supervision than her peers throughout her training, and failed to demonstrate the required progression toward independence from supervision.

13. On January 22, 2016, I attended a meeting with Dr. Canning, Tammy Wichman, M.D., who was IM Program Director at that time, and Bradley DeVrieze, M.D. We informed Dr. Canning that the CCC had conducted its semiannual review of residents' progress and had recommended that Dr. Canning be required to repeat her first year of residency. At the conclusion of that meeting, I asked Dr. Canning whether she would be willing to meet with Dr.

Geoff Anderson, a psychologist, who could help her with her learning skills. Dr. Anderson was an adjunct assistant professor of psychiatry, who was employed by the Graduate Medical Education Office as the Director of Academic Affairs. One of Dr. Anderson's roles was to assist underperforming residents by offering support services, and if needed, identifying stress or other factors, which could, if managed, allow the resident to succeed.

14. On February 12, 2016, Dr. DeVrieze and I again met with Dr. Canning to discuss her request for extra support. Attached as Exhibit A is a true copy of my notes from that meeting.

15. On February 18, 2016, I met with Dr. Canning and Joann Porter, M.D., the Associate Dean of Graduate Medical Education. Attached as Exhibit B is a true copy of my notes from that meeting.

16. Dr. Canning returned to the IM Program on July 1, 2016, and continued to have major performance deficiencies from the outset of the resumption of her residency. She again took the national IM-ITE® exam to assess her level of preparation and identify areas in which she had knowledge gaps when compared to her peers. Dr. Canning scored in the lowest 7% in the country when she retook the ITE exam.

17. Dr. Canning's performance failed to improve and she was placed "under review" on September 20, 2016. She was then placed on probation on December 20, 2016, and terminated on January 3, 2017. All of these actions were taken on the recommendation of the CCC and were fully-documented in Dr. Canning's file. Attached as Exhibit C is a true copy of an email that I sent

E

to Dr. Porter on December 30, 2016, in response to Dr. Canning's appeal of the decision to place her on probation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Erica K. Cichowski, M.D.

4818-3489-9065, v. 1

For her disciplinary file

**From:** Cichowski, Erica K. [mailto:Erica.Cichowski@va.gov]
**Sent:** Wednesday, March 16, 2016 11:47 AM
**To:** Porter, Joann L. <JoannPorter@creighton.edu>
**Subject:** Extra Support for MBC

2/12/16 documentation from meeting Brad and I had with Marybeth confirms I let her know that we had intentionally been assigning her strong supervisors to support her. "....She reminds us that she finished med school in Dublin 2008. She reports being very sick going through menopause in 2007 and struggled with her health upon return to the states and didn't have very much clinical exposure between 2008 and starting residency. She is asking for a very structured outline, objectives. We shared with her that we have grave concerns that her gap in knowledge and experience may be too large and that's why she isn't progressing since she was given specific feedback by dr. Lambrech and despite selecting the best supervisors to support her ...."

Chief residents make the HMS team assignments and they have been bringing peer concerns about Marybeth's performance to us since August 2015. They have been sharing these concerns in the setting of weekly chief resident meetings with program leadership. The R2 who supervised Marybeth in Block 2 came to them to concerns that Marybeth's fund of medical knowledge was low enough that she did not know the different between a Non STEMI vs a STEMI in regards to diagnosis and management. Despite this supervisor's significant time and attention to teaching Marybeth key learning points on common night float clinical scenarios, Marybeth did not seem to be retaining the information. From this point forward, the chiefs had taken it upon themselves to selectively assign teams with strong supervisors for Marybeth. Chiefs brought peer related concerns to chief meetings at least once/month since August because they recognized a serious deficiency yet struggled to give her unsatisfactory scores on peer evaluations because she is such a sweet person and hard worker. The fact that one indicated her medical knowledge was in line with the medical students yet gave her a satisfactory scores speaks to the hesitation we all have scoring residents accurately.

Thank you,

Erica

February 18 meeting with Mary Beth Canning and Dr. Erica Cichowski

The CCC has made 2 further decisions that she needs to be informed of.

1. It has been decided that it is better to ask Mary Beth to be put on leave with pay until her fitness for duty evaluation deemed she could safely care for patients at the level of a first year resident. It was discussed that she has not demonstrated proficiency expected of a first year resident, but more of a quite junior medical student, so she should not be functioning in this role.

   The Fitness for duty will be scheduled as soon as possible. It typically will take a few weeks to get this scheduled. She was informed that if she was fit for duty she would return to the residency and finish her PGY 1 year and receive credit for it.

   Mary Beth asked what would happen if she was not deemed fit for duty. She was informed that she would not be able to return to duty.

   She asked if other residents had ever had to do a fitness for duty and she was told yes. She was also told that some residents do get deemed fit for duty and are allowed to return to the program. It is Creighton's responsibility to patient safety to always ask a resident be deemed fit for duty if there is any concern the resident cannot

2. It has been decided that instead of having her repeat a year in the program, it is in her best interests that her contract for next year not be renewed. The CCC feels that according to the lack of progress she has made in this year that repeating a year would not change her status and she would still not be able to go on to a supervisory role.

It was explained to Mary Beth that the two decisions were two separate issues. If she was deemed fit for duty it still only meant that she would return and get credit for a year of residency. She still would not be eligible for renewal of her contract. As stated above the decision to not renew her contract is based on her inability to progress in her skills and competency in her intern year. Her being deemed fit for duty would not change the concerns about these issues.

Mary Beth was given both the Corrective Action Policy and the Resident Due Process Policy and those were both reviewed with her. She was informed these policies apply to the non-renewal decision and that she had a right to an appeal for the non-renewal decision.

She was also given a written letter notifying her of the Corrective Action taking place. Mary Beth signed she had received the letter.

CU 0398

| | |
|---|---|
| **From:** | Porter, Joann L |
| **Sent:** | Tuesday, January 03, 2017 8:49 AM |
| **To:** | Nelson, Julie L |
| **Subject:** | FW: Documentation |
| **Attachments:** | ResidentReport_Canning_6344_120457PM.PDF |

Here is the last set Erica sent me last week.

From: Cichowski Gjersvik, Erica K
Sent: Friday, December 30, 2016 1:14 PM
To: Porter, Joann L <JoannPorter@creighton.edu>
Subject: Documentation

Dear Appeals Committee:

I sincerely appreciate the opportunity to submit documentation for your review in support of our program's Clinic Competency Committee's (CCC) decision on 12/20/16 to place Dr. Canning (MBC) on probation for deficiencies outlined in the probation letter for your review.

On 12/25/16, I was called by one of our Hospital Medicine Service (HMS) attendings with serious concerns about MBC's performance in relationship to patient safety. A patient, admitted for pulmonary embolism, was nearly discharged on 12/24/16 by MBC without anticoagulants despite attending and supervisors efforts to review the discharge plans with her in detail. Even more concerning was MBC's response when notified of the error. She told her supervisor that she was sure she had continued the patient's home medications upon discharge. This statement signifies her lack of understanding of the sole purpose of the patient's admission: she failed the Coumadin she'd been on at home and needed to be changed to a novel agent. An IRIS report was entered. Additionally, MBC was unable to complete pre rounds in time for 9:30a rounds on 12/24/16 which may have contributed to the error. With the documentation we have outlining serious competency concerns, MBC's failure to adequately improve performance, need for ongoing direct supervision and despite supervisor and attending efforts, an egregious patient safety near miss occurred.

Marybeth came to us with nearly 8 years gap between medical school and residency, with very little clinical experience between. Our hope was that her tremendously positive attitude, compassionate demeanor, heart for service and passion for the Jesuit values, she would overcome this deficit and meet expectations after a steep learning curve. Regrettably, this has not been the case. Marybeth's deficiencies in patient care skills and medical knowledge have proven too great for her to overcome.

As you will see in the documentation provided, Marybeth has not been able to progress beyond full direct supervision because her foundation is so weak that she has not been able to build upon it with nearly 12 months of residency experience. You'll find clear documentation from her peers and attendings of her inability to consistently assess patients and propose a plan of care without significant support and delays in care. She cannot consistently place nor follow up on orders, nor synthesize those results accurately to adjust the plan of care appropriately. She cannot consistently prepare patients for discharge, nor facilitate a safe and timely discharge without significant support from her supervisors. I have received numerous unsolicited reports that MBC requires so much of the supervisor and attending's time and oversight that co interns are not consistently able to get the attention and teaching they need. Co interns are consistently unequally yoked with workload that MBC cannot handle. Medical student experience on her teams are negatively impacted, as they do not get the attention or teaching from the supervisors. Nursing staff have created work arounds, avoiding paging MBC and going directly to the supervisor, as they have lost confidence that MBC

1

**Attachment 3(a)**

EXHIBIT C

can provide safe care for patients. Of note, you'll see that the nursing supervisor gave MBC 5 (aspirational) marks on the nursing 360 degree evaluation and commented she was ready for unsupervised practice, but this was true for all residents the nursing supervisor evaluated and so regrettably the CCC was unable to utilize these evaluations. Evaluation inflation is something that is hampering programs across the country and our program is no different. Ongoing faculty development is something we are striving for. However, you will see that MBC's spider diagram clearly reflects she is performing significantly lower than her intern peers.
INSERT SPIDER HERE

See below the evaluation scale we use for the HMS intern evaluation. CCC will use this scale as a guide to predict which interns should be ready to progress on to the PGY 2 year—interns should be mostly at the level of 3 by the beginning of March. MBC's latest HMS evaluation had her at mostly 1.5 and occasionally at a 2.

| Level 1 | Level 2 | Level 3 | Level 4 |
|---|---|---|---|
| Able to observe only. Resident has critical deficiencies noted below. | Able to perform with direct supervision. At beginning intern level. | Able to perform with indirect supervision. Ready to supervise incoming interns. | Able to perform independently the level of a graduating resid: |

The CCC feels that our program has given MBC 12 months of residency training, and while she's improved some, her incompetency is negatively impacting patient safety and does not predict success in the future. Her insight into her deficiencies has been very poor throughout. She does not seem to have insight into the fact that her patient care and medical knowledge deficits pose significant patient safety issues. Regrettably this was confirmed by the 12/24/16 near miss and her failure to even understand her error.

We have the ultimate responsibility to all patients our residents treat while in our program and all those they treat upon graduation, to ensure their safety and wellbeing. MBC does not have the knowledge and skills to provide safe and effective patient care.

Thank you for your time,

Erica Cichowski

-----------------------------------------------------------------------------------------------------
-------------------------------------------------------