**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MARY E. CANNING,
  Plaintiff,
vs.                                Case No. 4:18 CV-03023
CREIGHTON UNIVERSITY,
  Defendant.
                                   DEPOSITION OF
                                   ERICA CICHOWSKI, M.D.

DEPOSITION OF ERICA CICHOWSKI, M.D. taken before Tammy J. Hetherington, RPR, CSR, and General Notary Public within and for the State of Nebraska, beginning at 9:22 a.m., on Friday, the 5th of October, 2018, at 12910 Pierce Street, Suite 200, Omaha, Nebraska, to be read in evidence on behalf of the plaintiff, pursuant to the Federal Rules of Civil Procedure and the within stipulations.

TAMMY J. HETHERINGTON, RPR, CSR
MTDS Reporters
Matheson, Taulborg, Denney & Schleife
7602 Pacific Street, Suite LL101
Omaha, Nebraska 68114
402-397-9669
www.mtdsreporters.com

**Page 2**

APPEARANCES

For the Plaintiff:   Mr. James C. Zalewski
                     Attorney at Law
                     575 Fallbrook Boulevard
                     Suite 100
                     Lincoln, Nebraska 68521
                     jzalewski@ozwlaw.com

For the Defendant:   Mr. David R. Buntain
                     Attorney at Law
                     12910 Pierce Street
                     Suite 200
                     Omaha, Nebraska 68144
                     dbuntain@clinewilliams.com

Also Present:        Ms. Mary Canning
                     Mr. David Meiergerd

**Page 3**

I N D E X
                                                     Page
DIRECT EXAMINATION BY MR. ZALEWSKI                     5

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 1 | Typed Complaint dated 2/16/16 | 24 |
| 2 | February 18 meeting with Mary Beth Canning and Dr. Erica Cichowski | 31 |
| 3 | 2/25/16 Letter by Peter Silberstein, M.D. | 42 |
| 4 | 2/29/16 letter by Jennifer Green | 43 |
| 5 | E-mail correspondence | 46 |
| 6 | E-mail correspondence | 50 |
| 7 | 6/7/16 Neuropsychological Fitness for Duty Evaluation | 57 |
| 8 | Graduate Medical Education Program Agreement 2016-2017 | 64 |
| 9 | E-mail correspondence | 64 |
| 10 | E-mail correspondence | 70 |
| 11 | 9/23/16 letter by Erica Cichowski, M.D. | 74 |
| 12 | Policies and Procedures, Corrective Action Policy | 81 |
| 13 | 8/24/16 Mary Beth Canning Documentation of Regular Meeting | 88 |
| 14 | 9/22/16 Mary Beth Canning Documentation of Regular Meeting | 89 |
| 15 | September-November 2016 Mary Beth Canning Documentation of Regular Meeting | 91 |
| 16 | Document by Dr. Mirza | 104 |
| 17 | E-mail correspondence | 106 |
| 18 | E-mail correspondence | 113 |
| 19 | New Innovations Residency Management Suite: Portfolio | 115 |
| 20 | Document provided by Defendant | 116 |
| 21 | Supervision of Residents | 123 |
| 22 | Resident Transfers | 127 |
| 23 | 1/5/17 letter by Dr. Carolyn Manhart | 129 |
| 24 | letter by Dr. Joleen Fixley | 130 |
| 25 | 1/5/17 letter by Dr. Timothy Griffin | 131 |
| 26 | 1/13/16 Faculty Evaluation of IM Resident | 135 |
| 27 | 8/26/16 HMS - End of Service Evaluation for Interns | 136 |
| 28 | 12/9/16 HMS - End of Service Evaluation for Interns | 136 |

**Page 4**

| No. | Description | Page |
|---|---|---|
| 29 | 1/3/17 Termination Letter of Mary Beth Canning | 139 |
| 30 | E-mail correspondence | 140 |
| 31 | E-mail correspondence | 143 |
| 32 | E-mail correspondence | 144 |
| 33 | 11/11/16 Notification of Under Review | 146 |

COPY

## Page 65

1 Q. In the middle of what I'll call the third paragraph --
2     well, the first full paragraph under the Special CCC,
3     where it says, Andrea Jahn announced; do you see that
4     paragraph?
5 A. Yes.
6 Q. The statement in there is regarding Mary Beth returning
7     on a verbal performance improvement plan. You say,
8     Mary Beth is aware that. Who told her that?
9 A. I think -- I'm not sure. I don't remember who told her
10     that.
11 Q. Somebody at the committee must have said that, because
12     the note says, Mary Beth is aware she is returning on a
13     PIP.
14 A. I don't remember that specific detail.
15 Q. Did you tell her that?
16 A. I don't recall telling her that.
17 Q. Is that -- being on a PIP, and being an employee, is
18     that something that human resources would deal with?
19 A. No.
20 Q. Something that your office would deal with?
21 A. Yes.
22 Q. Do you have any idea, then, how the statement came up
23     that she was aware she was going under a PIP?
24 A. I don't.
25 Q. Does Julie Nelson, pretty much, take accurate notes, to

## Page 66

1     the best of your knowledge?
2 A. Yeah.
3 Q. Did you later, when Mary Beth came back, tell her,
4     okay, I just want to clarify, you're on a performance
5     improvement plan?
6 A. No.
7 Q. Any reason you did not?
8 A. Because all of our residents are, really, on
9     performance improvement plans; that's the nature of
10     residency. You come in with a skill set as your
11     foundation from medical school, and everyone is there
12     to improve their performance.
13 Q. But a performance improvement plan is part of a
14     disciplinary matter that --
15 A. It is not, no, not in residency. It's not part of
16     their record. It's simply the Clinical Competency
17     Committee -- a tool for the Clinical Competency
18     Committee, and the resident, to communicate more
19     clearly, and that's when it's written out.
20 Q. Would every resident's file say, you're on a verbal
21     performance improvement plan?
22 A. No. This wasn't in her file, though, to my knowledge.
23     This was communication. These were minutes from the
24     Clinical Competency Committee.
25 Q. And I'm just trying to go back to what you said a

## Page 67

1     little earlier about every resident is on a performance
2     improvement plan.
3 A. That's the nature of -- that's the nature of training,
4     so it's not disciplinary.
5 Q. And I fully understand you're trying to get people to
6     improve their skill set when they're becoming doctors
7     and as they're going on past med school, I get that
8     part. I'm talking about a PIP in the sense of, this is
9     a part of our human resources policy, we put
10     employees --
11 A. That's not this.
12 Q. -- on a PIP. That's not that, you said?
13 A. That's not this. This is not a human resource
14     document.
15 Q. All right. What is the program director's PIP then?
16 A. It's a tool to communicate with residents specific
17     examples of where they may be deficient or not
18     progressing in the competencies, and how they can get
19     there.
20 Q. Okay.
21 A. It's a tool designed to be supportive.
22 Q. Is it done by the faculty mentor?
23 A. Yes, a lot of times, it is, yeah.
24 Q. And who was Mary Beth's faculty mentor at this time?
25 A. At that time, I believe it was me.

## Page 68

1 Q. So then did you meet with her and tell her, you're on a
2     PIP?
3 A. We -- I don't believe that we met until September. I
4     don't recall meeting with her before September.
5 Q. Is there a reason why you would not tell her before
6     then that -- because you're starting the year in July,
7     right?
8 A. Yeah.
9 Q. Okay, you come in in July. Is there a reason you don't
10     sit down and say, hey, I'm your faculty mentor. Just
11     to keep going in accordance with the policy, you're on
12     a verbal PIP?
13 A. I've never done that. That doesn't happen. We
14     typically don't meet with them until at least a couple
15     of months have passed.
16 Q. But this is a unique situation, as you said, right?
17     She's repeating her first year?
18 A. Yeah, but the whole purpose of this meeting is that
19     Mary Beth deserves a fresh start, and the program
20     deserves a fresh start with Mary Beth, and we're going
21     to try to keep things as usual as they were, because
22     that's fair. And I think the reference to that
23     statement is more -- I believe I recall one of our
24     questions, both to Lynn and to Andrea, was, should we
25     start out with a written performance improvement plan,

137

1  Q.  This is the first year, right?  This is her first-year
2      score?
3  A.  This is her first-year score.
4  Q.  Right.
5  A.  Okay.
6  Q.  Then you look at the next two, they seem to go down to
7      the level 1 or 1.5.
8  A.  This -- my explanation for this is that we did a lot of
9      faculty development about what these levels mean in
10     that time period.  So the degree of inflation that
11     we've had each year has decreased, and that would be my
12     explanation for that.
13 Q.  Okay.  Did you ever look at these and talk to
14     Dr. Abu Hazeem to ask the question, you say she's doing
15     better, but her scores are lower?
16 A.  I did not.  All this conversation was in the Clinical
17     Competency Committee.
18 Q.  Did you bring it up to his attention during that
19     meeting?
20 A.  I did not.
21 Q.  Do you know if anybody else did?
22 A.  Not that I'm aware of.
23 Q.  Did you ever tell him, or any other doctor, that 2's
24     are good enough as far as passing -- or grading a
25     resident to proceed with their training?

138

1  A.  No.
2  Q.  When you're doing this reevaluation of scoring and
3      grading and levels --
4  A.  Uh-huh.
5  Q.  -- did you ever tell the supervisors of interns that a
6      2 was sufficient?
7  A.  I would have clarified what a 2 means.
8  Q.  All right.  What does it mean to you?
9  A.  It means that they require -- right what it says in
10     here, this is what it means; that they need direct
11     supervision in order to do these things (indicating).
12 Q.  For the record, you're pointing at something, which is
13     Exhibit 26, right?
14 A.  Correct.
15 Q.  And you were pointing at the second column?
16 A.  Correct.
17 Q.  Okay.  And did you get any feedback from Dr. Abu Hazeem
18     on what that meant, or how he would grade people in the
19     future?
20 A.  I did not.
21 Q.  And if I understand correctly, you, nor anyone else in
22     the Competency Committee, did not compare his written
23     comments to his scores to see if they were consistent?
24 A.  No, because we were addressing the issue of improvement
25     and inflation with all evaluators.

139

1      (Exhibit No. 29 marked for identification.)
2  Q.  (BY MR. ZALEWSKI)  You've been handed Exhibit 29.
3      You've seen that before, correct?
4  A.  Yes.
5  Q.  And this is the termination letter?
6  A.  Yes.
7  Q.  You have described for me earlier how the CCC met, I
8      believe, what, first -- early in January, or was it the
9      last week of December?
10 A.  I don't remember.
11 Q.  Okay.  I'm just thinking, if you wrote the letter dated
12     January 3rd, the CCC must have met sometime --
13 A.  I would assume that, yes.
14 Q.  -- in that time period?
15     Okay.  John Hurley signs the letter also; is there
16     any special reason for that?
17 A.  Yes.  He was part of that termination meeting in an
18     effort to meet the request earlier.
19 Q.  When did you present this to Mary Beth Canning?
20 A.  I believe, on 1/5.
21 Q.  All right.  In person?
22 A.  Yes.
23 Q.  What do you recall about that meeting?
24 A.  I documented that meeting in writing.  I have not
25     reviewed that documentation.  I don't remember anything

140

1      specific besides the conversations related to what's
2      documented here in the deficiencies.
3  Q.  You might be right on track with the next one here.
4      (Exhibit No. 30 marked for identification.)
5  Q.  (BY MR. ZALEWSKI)  I've handed you Exhibit 30, and it
6      appears that, underneath the dotted lines on the bottom
7      of Page 1, this says, Documentation Termination
8      Meeting.  Would that be, then, your documentation of
9      what happened?
10 A.  Yes.
11 Q.  Okay.  Do you see the second paragraph where Mary Beth
12     indicated she had two patients on anticoagulation and
13     maybe mixed up the two in her mind?  In other words,
14     the error of omission and not medical knowledge; do you
15     recall that being raised?
16 A.  I documented; I don't recall it.
17 Q.  And, also, in the third paragraph, we have, again, that
18     issue on direct supervision, which we went through
19     previously; do you recall that being raised?
20 A.  Yes.
21 Q.  What do you recall about that?
22 A.  That we talked about that direct supervision was
23     necessary, and we were still having some patient safety
24     concerns.
25 Q.  This, then, goes on to a January 7th meeting

### Page 141

1  afterwards, after the termination letter was given; do
2  you see that?
3  A. Yes.
4  Q. What are we documenting here at this point?
5  A. Meeting -- Dr. Fixley asked to speak with me.
6  Q. Do you recall, at all, the discussion with Dr. Fixley
7     about whether or not she should appeal this or not, or
8     what her options were?
9  A. All I recall is what I wrote here.
10 Q. What I'm looking at is that next-to-last sentence that
11    says: Joleen says she does not think MBC understands
12    this and could be hurting her future options. Do you
13    recall what was being discussed there?
14 A. After I read it, yes.
15 Q. Okay. What is that then? I guess I don't understand
16    why appealing would hurt her future options. What did
17    that mean?
18 A. The sentence prior to that, but if MBC elects to appeal
19    her termination, then the option for withdrawing is no
20    longer available to her. So if she appeals and loses,
21    she's terminated. If she withdraws on her own, it
22    could change her future. I mean, it could be a
23    different -- that's all the conversation was.
24 Q. If somebody withdraws, what's the difference, then, on
25    what their options are?

### Page 142

1  A. You know what, that's a better question for Dr. Porter
2     on the GME level. I don't have a lot of understanding
3     on that.
4  Q. Then it looks like you met with Dr. Griffin on
5     January 14th; do you see that?
6  A. Yes.
7  Q. Dr. Griffin evidently said, all of us make mistakes and
8     could put patients in danger. You say, I agree, but
9     this is an error of omission -- or that an error of
10    omission should be caught. Do you see those writings
11    on the bottom?
12 A. Yes.
13 Q. But then you said, Mary Beth admitted she had little
14    understanding of the reason, or clinical reason for the
15    hospitalization?
16 A. Correct.
17 Q. Is that what you explained to me earlier?
18 A. That is correct.
19 Q. Did Dr. Griffin say he disagreed with the termination?
20 A. I don't recall him saying one way or another. When I
21    say, after that, he agreed, I believe I was referring
22    to the difference between an error -- a medication
23    omission, and not having an understanding of the
24    medical case.
25 Q. Then it looks like you're documenting other things you

### Page 143

1  received from residents that are not named. Is this
2  for the appeals process, or what are you doing with
3  this?
4  A. This was just my documentation.
5  Q. Okay. And Mary Beth appealed her termination decision,
6     correct?
7  A. I believe she did.
8     (Exhibit No. 31 marked for identification.)
9  Q. (BY MR. ZALEWSKI) I'll hand you Exhibit 31, which
10    looks like it's an E-mail from you to Dr. Porter; is
11    that correct?
12 A. Correct.
13 Q. You covered the notes of the three of you earlier that
14    you kept with regard to Mary Beth. Did you add
15    anything to Exhibit 31, either orally or in writing, or
16    just kind of summarized the notes that we reviewed
17    earlier?
18 A. I copied them from my secure document on my drive to
19    the E-mail.
20 Q. Okay. I mean, they look the same to me. I just wanted
21    to know if you added anything that you thought of or --
22 A. No.
23 Q. Any verbal phone calls or anything go with this --
24 A. No.
25 Q. -- or it's, pretty much, by itself?

### Page 144

1  A. Uh-huh.
2  Q. That's a yes?
3  A. Just copy and pasted.
4     (Exhibit No. 32 marked for identification.)
5  Q. (BY MR. ZALEWSKI) I've handed you Exhibit 32. You've
6     seen this before, correct?
7  A. I don't believe I have.
8  Q. You haven't? Okay.
9  A. This communication did not involve me.
10 Q. So this is from Dr. Porter to Mary Beth Canning, right?
11    Did you have any input on what was coming in here at
12    all on this communication?
13 A. No.
14 Q. So anything that is said in here by Dr. Porter, she did
15    not review with you?
16 A. I don't know if she did or not.
17 Q. Well, would you read it and tell me if you think she
18    did?
19 A. She may have mentioned, informally, what Mary Beth's
20    options were.
21 Q. Did Dr. Porter at all discuss with you what she was
22    going to put in this E-mail before she sent it?
23 A. Not that I'm aware of.
24 Q. Well, to your knowledge, what were her options at that
25    point?

Page 153

1 out.
2 Q. What do you recall about that incident?
3 A. What I recall about that is that was feedback given by,
4 I believe, a night flow supervisor who was called by
5 the nursing staff to come and talk with this patient,
6 who left a conversation with Mary Beth thinking that
7 she did not -- couldn't have opioid pain relief because
8 she might become addicted, and her impression came from
9 her conversation with Mary Beth.
10 I wasn't there, I can't comment on it. That's the
11 information I was given. That was documented as one
12 example and discussed at the meeting.
13 Q. So this was, I guess, like, a complaint from a patient
14 to a nurse?
15 A. This -- I don't know if the patient complained or not.
16 This was feedback from a supervisor, based on his or
17 her, I don't know, experience with that patient, and
18 that nurse.
19 Q. Okay. Did Mary Beth explain her version of the facts
20 to you at that meeting?
21 A. I don't recall.
22 Q. Okay. Had the probation decision already been made by
23 the time these things came up?
24 A. They had to have been discussed in the CCC because they
25 were included in the document.

Page 154

1 Q. And was any of that told to her, in any of her under
2 review meetings she had with you, prior to being put on
3 probation?
4 A. I was not aware of that incident until the CCC meeting,
5 I believe, is where that came up.
6 Q. Does it help your recollection any to know you told
7 Mary Beth Canning it came from an IRIS report? This is
8 about the ovarian cancer patient.
9 A. I don't recall.
10 Q. And isn't it true Mary Beth would have prescribed
11 opioids for other patients, including cancer patients?
12 Did she discuss that with you?
13 A. I don't -- I don't recall that discussion, no.
14 MR. ZALEWSKI: I don't have any other
15 questions.
16 MR. BUNTAIN: You have a right to read
17 the deposition to make sure it's been taken down
18 correctly, but you can also waive that right. I
19 guess I'll leave it up to you to decide whether
20 you want to read it or not.
21 THE WITNESS: Okay.
22 MR. BUNTAIN: Do you want to or --
23 THE WITNESS: No.
24 MR. BUNTAIN: Okay, that's fine.
25 (Deposition concluded at 1:46 p.m.)

Page 155

CERTIFICATE

STATE OF NEBRASKA  )
                   ) ss.
COUNTY OF DOUGLAS  )

I, TAMMY J. HETHERINGTON, RPR, CSR, and General Notary Public in and for the State of Nebraska, do hereby certify that ERICA CICHOWSKI, M.D., was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth; and that the deposition as above set forth was reduced to writing by me and is a true and accurate transcription of the testimony given by said witness;

That the within and foregoing deposition was reported by me at the time and place herein specified and in accordance with the within stipulations, the reading and signing of the witness to the deposition having been expressly waived;

That I am not counsel, attorney or relative of any of the parties or otherwise interested in the event of this suit.

IN TESTIMONY WHEREOF, I have placed my hand and Notarial Seal this 17th day of October, 2018.

_____
General Notary Public

Page 156

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MARY E. CANNING,          )
                          )
      Plaintiff,          )  Case No. 4:18 CV-03023
                          )
  vs.                     )
                          )
CREIGHTON UNIVERSITY,     )
                          )  COST CERTIFICATE
      Defendant.          )
_____)

CERTIFICATE OF DEPOSITION OF ERICA CICHOWSKI, M.D.

Taken in behalf of
the plaintiff.

The Original Deposition is
in the possession of:

Mr. James C. Zalewski
Attorney at Law
575 Fallbrook Boulevard
Suite 100
Lincoln, Nebraska  68521

Costs:

_____
Tammy J. Hetherington
Notary Public

Date: 10/17/18

| | |
|---|---|
| From: | Porter, Joann L |
| Sent: | Tuesday, January 17, 2017 4:07 PM |
| To: | Smith, James F; Marcus Balters; Kropp, Chelsea N |
| Cc: | Wollen, Maria A |
| Subject: | FW: IM Program Documentation for MBC termination appeal |

Thank you for serving on the appeals committee. I am forwarding this documentation below and will send the programs file on the resident in another email. I am awaiting the appeals packet from the resident and will send it as soon as I get it.
Joann Porter

From: Cichowski Gjersvik, Erica K
Sent: Tuesday, January 17, 2017 2:36 PM
To: Porter, Joann L <JoannPorter@creighton.edu>
Cc: Nelson, Julie L <JULIENELSON@creighton.edu>
Subject: IM Program Documentation for MBC termination appeal



Dr. Porter,

On behalf of my program, I respectfully submit the following documentation to support our CCC's decision to terminate MBC on 1/3/2017 due to an egregious patient safety near miss that occurred on 12/24/2016 despite attending and R3 supervisor's direct supervision of an inpatient discharge.

There is one addition document that I was told today is in my mail box at CUMC—documentation from Dr. Mirza.

I will ask Julie if she would kindly scan that document in and email to you tomorrow morning to be included in this packet.

Please let me know if anything further is needed.

Sincerely,

Erica

---

Documentation Termination meeting 1/3/17 6:50a John Hurley CCC member & myself with MBC

I asked Marybeth to recount for us the details of the patient safety concern that occurred on HMS on Dec 24, 2016. She indicated that she had forgotten to write for anticoagulation upon discharge for a patient and that she understood this was a potentially deadly mistake for this patient. She expressed gratitude that the nurse had caught it and also thought perhaps the pharmacist was working that day and had caught it too.

I asked her to expand on why she thought this mistake occurred. She indicated that she had two patients on anticoagulation and felt she mixed the two up in her mind. She also relayed that she felt the stress she's been under since we put her on Probation and she thought this could have contributed.


I shared with her that patient safety has to be our #1 priority when we educate trainees. I reminded her that Dr. Destefano and I shared with her that as long as patients can be safe and satisfied with her care under direct supervision,

1

Exhibit 11(b)

then should could potentially complete that year but if any patient safety issues occurred that termination would be our only ethical option. I acknowledged that perhaps she feels this is unjust but from the CCC perspective, what would be more unjust is if we allow her to practice unsafely and she harms someone and she would never forgive herself because she has such a compassionate heart.

She asked Dr. Hurley if agrees with this. He indicated that he's a CCC member, has been involved with all the discussion and decision making and again reviewed the documentation and agrees with this course of action because it's clear that she is unable to progress adequately to be able to treat patients safely.

She gave us her pager and the meeting ended.

---

Saturday Jan 7, 2017 VA Blue room

Joleen Fixley asked to speak with me. She updated me that MBC contacted her and Tim Griffin to seek a supportive letter from each of them. Joleen said MBC shared honestly, all the struggles she's been having since rounding with them earlier this academic year. Joleen reviewed much of what was outlined in MBC's Under Review and Probation letters, as well as the event that lead to MBC's termination. Joleen wanted me to know that the low patient volumes, much slower pace on VA HMS did allow her and the supervisor to safely provide direct supervision. Joleen feels MBC's kind, compassionate heart is her strength. She admitted that MCB spent a lot of time connecting emotionally with patients and families but this often seemed to distract her from the medical tasks at hand. Joleen felt MBC had improved this year as compared to her performance on VA HMS last academic year. An example she used was that MBC was able to call her when she recognized a deteriorating patient but was unable to develop a plan of care for that patient. While this was an improvement in MBC's performance, we both agreed that this action was at the level we expect from medical students, rather than interns. Joleen also admitted that after walking MBC through the assessment and development of a plan of care for that deteriorating patient, MBC was unable to document in the medical record without significant help. Joleen explained that she hoped MBC could remain in some sort of healthcare service career as she's passionate about helping people. She mentioned Family Medicine but upon further discussion, we both agreed that MBC does NOT have the knowledge and skills to be successful in the ICU rotations necessary to graduate from a Family Medicine program. Joleen clarified for me that she wants to support MBC but does NOT feel that MBC should be reinstated our program. She wants to support her in seeking alternative career options. She also is curious why MBC is appealing her termination because MBC shared with her that she no longer wants to continue on with Internal Medicine training and admitted she doesn't have the skill set for success in Internal Medicine. I clarified for Joleen that GME had offered MBC counsel that withdrawing from the program would keep the termination off her record, perhaps helping her be successful in seeking other career options. But if MBC elects to appeal her termination, then the option of withdrawing is no longer available to her. Joleen said she does not think MBC understands this and could be hurting her future options. I shared with Joleen that Dr. Porter let me know face to face that MBC was counseled on her time sensitive option to withdraw. Upon conclusion of this conversation with Joleen, I updated Dr. Porter on the potential confusion on MBC's part.

---

Thursday Jan 14, 2017

Tim Griffin came to VA Red Clinic to request to speak with me in private. He shared with me that MBC had contacted him for a letter of support. He wanted me to know that he felt obligated to provide her a letter of support because she's such a nice person. He also felt obligated to document that because of the VA HMS' low patient volume and slower pace, he did not experience an inability to provide safe patient care while providing her ongoing direct supervision. He did indicate that he felt the program had provided her plenty of support and opportunity to improve. He also admitted that his previous inpatient work at CUMC allows him to see that perhaps the fast pace and high patient volumes at that site could prove challenging with MBC and her limited skill set. In regards to her termination after forgetting to discharge a patient on anticoagulants, he fears that all of us make mistakes that could put patients in danger. I agreed but shared with him that an error of omission of a discharge medication should be caught with appropriate system support (and was caught in this case), but when a medical provider defends the error by admitting he/she had little

understanding of the clinical reason during the hospitalization, the core competency deficiencies are highlighted as the case of the error. He agreed. He concluded the meeting by indicating he wanted me to know that he is supportive of the program's decision to terminate based on a long history of deficiency without significant enough improvement with program support. I thanked him for his communication.

---

Email received 1/12/17 from an R3 Chief Resident:

To whom it may concern:

I had the opportunity to work with Mary Beth Canning in a hospital wards setting. I interacted with her and observed her performance over the rotation. She required continuous direct supervision in all aspects of her position as an internal medicine resident. I do not feel that she is able to successfully manage patients without constant direct supervision. In the name of patient safety and patient care I would not feel comfortable or safe with Mary Beth Canning training under my medical license.

Regards,

---

Documentation received by email on 1/15/17 by an R3 Chief Resident:
"Re: Dr. Mary Beth Canning

A resident must be both proficient in medical knowledge as well as efficient with the usage of their time. A deficiency in either makes the path toward success much more difficult. A deficiency in both of these areas is the most concerning as it can lead to lapses in patient care. I have worked both as a team member with Dr. Canning as well as observed her interacting with colleagues and other members of the health care team. It is my opinion that she has severe deficiencies in both of the above mentioned areas. I believe this puts a large strain on the medical team as a whole as well as the ff physicians in charge of overseeing her work. If I were a staff physician, I would not feel comfortable having her as a resident on the team."

---

Email received 1/15/17

Erica and everyone,

I have documented my concerns about Marybeth Canning in my evaluation. However, I continue to have concerns about her ability to function as a physician leader despite our program's efforts to give her more time to adequately acclimate and work to meet our minimum standards.

Physicians need to be able to have the ability to function as high level managers, managing patient care and the care team to achieve the best outcomes. With regard to Marybeth, I have significant concerns about her ability to manage small and basic tasks. Essentially, I do not believe that Marybeth has the needed skill level that is required by our profession. I do not believe she has the depth of inquiry, knowledge, or insight that one expects at this level. At this time, I believe we would be doing a disservice to our profession and program if we were to graduate someone that has continuously shown that she is not able to meet the basic demands and standards of our program or profession.

I would be happy to answer any questions or concerns with regard to this letter, please call, anytime.

Sincerely,