**Page 83**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MARY E. CANNING,            )
            Plaintiff,      )   Case No. 4:18 CV-03023
    vs.                     )
CREIGHTON UNIVERSITY,       )
            Defendant.      )   (CONT'D) DEPOSITION OF
_____)   BRADLEY DeVRIEZE, M.D.

(CONT'D) DEPOSITION OF BRADLEY DeVRIEZE, M.D., taken before Tammy J. Hetherington, RPR, CSR, and General Notary Public within and for the State of Nebraska, beginning at 9:32 a.m., on Friday, the 14th of December, 2018, at 12910 Pierce Street, Suite 200, Omaha, Nebraska, to be read in evidence on behalf of the plaintiff, pursuant to the Federal Rules of Civil Procedure and the within stipulations.

TAMMY J. HETHERINGTON, RPR, CSR
MTDS Reporters
7602 Pacific Street, Suite LL101
Omaha, Nebraska  68114
402-397-9669
www.mtdsreporters.com

**Page 84**

APPEARANCES

For the Plaintiff:    Mr. James C. Zalewski
                      Attorney at Law
                      575 Fallbrook Boulevard
                      Suite 100
                      Lincoln, Nebraska  68521
                      jzalewski@ozwlaw.com

For the Defendant:    Mr. David R. Buntain
                      Attorney at Law
                      12910 Pierce Street
                      Suite 200
                      Omaha, Nebraska  68144
                      dbuntain@clinewilliams.com

Also Present:         Ms. Mary Canning
                      Mr. David Meiergerd

**Page 85**

I N D E X
                                            Page
DIRECT EXAMINATION BY MR. ZALEWSKI (CONT'D)  86

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 30 | E-mail with CCC agenda and notes | 89 |
| 31 | RMS Evaluations | 98 |
| 32 | 12/20/16 letter re: Probation | 105 |
| 33 | 1/19/17 HMS - End of Service Evaluation for Interns | 108 |
| 34 | Resident Evaluation document | 115 |
| 35 | Documentation re: Mary Canning | 115 |
| 36 | CCC Milestone Review December 2016 | 116 |
| 37 | 7/1/16 - 12/31/16 Summary of Evaluations | 118 |
| 38 | E-mail correspondence | 120 |
| 39 | 1/3/17 Clinical Competency Ad Hoc Committee Meeting | 125 |
| 40 | 1/3/17 Termination Letter | 126 |
| 41 | E-mail correspondence | 127 |
| 42 | Document by Dr. DeVrieze | 129 |
| 43 | 11/11/16 Notification of Under Review | 131 |
| 44 | 1/16/18 letter by Dr. Furman McDonald with attachments | 133 |

**Page 86**

(Whereupon, the parties have stipulated to waive Nebraska Rule 6-330, Sections 8(A) and (C), and the following proceedings were had, to wit:)

BRADLEY DeVRIEZE, M.D.,
having been first duly sworn,
was examined and testified as follows:

DIRECT EXAMINATION (CONT'D)

BY MR. ZALEWSKI:

Q. Doctor, we're picking up where we -- to continue your deposition from the last time, so I'm not going to go through all the instructions. I guess, just to remind you, you're still under oath, and if you don't understand my question, tell me, and I'll try to rephrase it, all right?

A. Yes.

Q. And, also, I guess, to give the audible answer, just to make sure we get that on the record.

I want to start when Mary Beth Canning was coming back right around the start of her repeat year, okay? When did you find out she was going to repeat the year?

A. It was relayed to us at a core faculty meeting. I don't remember which meeting it was.

Q. Did they start, like, in June or July; is that right?

A. The residents start July 1st, yeah.

Q. So sometime, maybe, in June, you would have found out?

127

1  A. I don't recall writing it, no.
2  Q. Tell me how the system works. After the CCC makes a
3     recommendation on this, it goes to Dr. Cichowski,
4     right?
5  A. Yes.
6  Q. Is there any involvement by the CCC after that point?
7           MR. BUNTAIN: Are you talking about in
8     this specific instance?
9  Q. (BY MR. ZALEWSKI) Yes, when you're terminating a
10    resident.
11 A. At that point, it went to Dr. Cichowski and to the
12    graduate medical education office.
13 Q. Right. My question is, does the CCC involvement
14    continue, or does it stop there?
15 A. It would have stopped at that point.
16        (A break was taken.)
17        (Exhibit No. 41 marked for identification.)
18 Q. (BY MR. ZALEWSKI) Dr. DeVrieze, the reporter handed
19    you Exhibit 41. What I want you to look at is the
20    second page, it talks about a probation meeting; do you
21    see that? At the bottom, the second page, on the
22    bottom, it starts off with, Probation Meeting.
23 A. Yes.
24 Q. Okay. And it says that you and Mary Beth met with
25    Erica Cichowski. If you would, please let me know when

128

1     you've finished reading this, and tell me if you agree
2     it's accurate notes of what happened at that meeting.
3  A. (Witness reviewing Exhibit 41.) Yes.
4  Q. Is that an accurate summary of what you discussed at
5     that probation meeting?
6  A. Yes.
7  Q. On the top of Page 3, there's a discussion about the
8     lady with ovarian cancer; do you see that?
9  A. Yes.
10 Q. Did Mary Beth explain to you that she was simply
11    telling the patient what her options were about the
12    opioid addiction, and not trying to deny her treatment?
13 A. I don't recall that conversation.
14 Q. Do you recall anything else about the meeting, now that
15    you've seen these notes?
16 A. No.
17 Q. This, pretty much, summarizes what happened that day?
18 A. Yes.
19 Q. Let me ask you this: Did the CCC talk to either
20    Dr. Timothy Griffin or Dr. Carolyn Manhart before
21    deciding on the probation for Mary Beth Canning?
22 A. I don't remember.
23 Q. The reason I ask is they both submitted letters on her
24    appeal, but I just wondered if you had information from
25    them before you made the probation decision.

129

1  A. I never had a conversation with either of those two
2     prior to that.
3  Q. And would you have seen any information they submitted
4     on behalf of Mary Beth Canning at the time you made the
5     probation decision?
6  A. Only evaluations.
7  Q. Not the letters, then?
8  A. I don't believe so.
9  Q. And you didn't call either one of them to talk about
10    how she's performing for them?
11 A. I did not, no.
12 Q. Do you know if anybody at the CCC did, or brought that
13    up?
14 A. Not that I recall.
15 Q. What kind of involvement did you have, with respect to
16    Mary Beth Canning, after that termination decision?
17 A. I don't know that I had any.
18 Q. Okay. Did you, for example, talk to the appeals
19    committee at all, when she appealed the decision,
20    either on probation or termination?
21 A. I don't recall doing that.
22 Q. Okay.
23        (Exhibit No. 42 marked for identification.)
24 Q. (BY MR. ZALEWSKI) Dr. DeVrieze, I've handed you
25    Exhibit 42. I'd ask you if you've seen that document

130

1     before.
2  A. It appears I wrote it, yes.
3  Q. Okay. And it looks like it went to the appeals
4     committee, correct?
5  A. Yes.
6  Q. Do you know if anybody asked you to make that comment,
7     if you did it voluntarily, or how that occurred?
8  A. I don't remember.
9  Q. Would it be your practice to send something to the
10    appeals committee if you heard a resident was appealing
11    a decision?
12 A. Probably not unsolicited.
13 Q. Do you see on top, it says, J. E. Lambrecht on there?
14 A. Yes.
15 Q. Do you recall if Dr. Lambrecht asked you to write the
16    letter?
17 A. No, I don't recall that.
18 Q. Anything else you recall about sending on Exhibit 42?
19 A. No.
20 Q. Did you ask Dr. Lambrecht anything about what should be
21    put in the letter you sent on January 16th?
22        MR. BUNTAIN: I'm going to state, for
23    the record, this shows it's Page 4 of a larger
24    document.
25        MR. ZALEWSKI: Right. This is an

**Nelson,**

| | |
|---|---|
| **From:** | [illegible], Jeann L. |
| **Sent:** | Monday, January 02, 2017 9:49 AM |
| **To:** | Nelson, Julie L. |
| **Subject:** | MB Documentation |
| **Attachments:** | ResidentReport_Canning_[illegible].PDF |

Here is [illegible] from last week.

**From:** Cichon [illegible]
**Sent:** Friday, [illegible]
**To:** Porter, Jean [illegible]
**Subject:** Documentation

Dear Appeals Committee:

I sincerely appreciate the opportunity to submit documentation for your review of the competency [illegible] Competency Committee's [illegible] decision on 12/20/16 to dismiss Marybeth Canning (MBC) as a graduating fellow [illegible] in the process [illegible] review.

On 12/25/16, I was called by one of our Hospital Medicine Service (HMS) attendings with serious concerns about MBC's performance in [illegible] to patient safety. A patient, admitted for pulmonary embolism, was [illegible] discharged on 12/24/16 by MBC without anticoagulants despite attending and supervisor efforts to review the case with her in detail. Even more concerning, was MBC's response when notified of the error. She told her supervisor that she was sure she had continued the patient's home medications upon discharge. This statement signifies her lack of understanding of the sole purpose of the patient's admission: she failed the Coumadin she'd been on at home and needed to be changed to a novel agent. An IRIS report was entered. Additionally, MBC was unable to complete am rounds in time (by 3 [illegible]) on 12/24/16 which may have contributed to the error. With the [illegible] we [illegible] have outlined serious competency concerns, MBC's failure to adequately improve performance, need for ongoing **direct** supervision and dismissive supervisor and attending efforts, an egregious patient safety near miss resulted.

Marybeth came to us with nearly 8 years gap between medical school and residency, with very little clinical experience between. Our hope was that her tremendously positive attitude, compassionate demeanor, heart for service and passion for the Jesuit values, she would overcome this deficit and meet expectations after a steep learning curve. Regrettably, this has not been the case. Marybeth's deficiencies in patient care skills and medical knowledge have proven too great for her to overcome.

As you will see in the documentation provided, Marybeth has not been able to progress beyond full direct supervision because her foundation is so weak that she has not been able to build upon it with nearly 12 months of residency experience. You'll find clear documentation from her peers and attendings of her inability to consistently assess patients and propose a plan of care without significant support and delays in care. She cannot consistently place nor follow up on orders, nor synthesize those results accurately to adjust the plan of care appropriately. She cannot consistently prepare patients for discharge, nor facilitate a safe and timely discharge without significant support from her supervisors. I have received numerous unsolicited reports that MBC requires so much of the supervisor and attending's time and oversight that co interns are not consistently able to get the attention and teaching they need. Co interns are consistently unequally yoked with workload that MBC cannot handle. Medical student experience on her teams are negatively impacted, as they do not get the attention or teaching from the supervisors. Nursing staff have created work arounds, avoiding paging MBC and going directly to the supervisor, as they have lost confidence that MBC

can provide safe care for patients. Of note, you'll see that the nursing supervisor gave MBC 5 (aspirational) marks on the nursing [...] evaluation and commented she was ready for unsupervised practice, but this was [...] all residents [...] nurses upgrading evaluated and so regrettably the CCC was unable to utilize those evaluations [...] this type of initiative is something that is hampering progress across the country and our program is no different. [...] faculty development is something we are striving for. Moreover, you will see that MB's radar diagram clearly reflects she is performing significantly lower than her intern peers.
INSERT SPIDER HERE

See below [...] evaluation scale we use for the PGY5 intern evaluation. CCC will use the scale in a grid like system which interns should be progressing so her mid PGY 2 year milestones should be mostly at a mid-level 2 to high level 2 range of Marks. [...] her evaluation had her at mostly 2.5 and occasionally at a 2.

| Level 1 | Level 2 | Level 3 | Level 4 |
|---|---|---|---|
| [illegible] | Works guidance with direct supervision. Attempting basic tasks. | [illegible] supervision. Fairly incompetent. General tasks. | [illegible] intently. Earlier stages in progression |

The CCC feels that our program has given MBC 12 months of residency training, and while she's improved some, her incompetence is negatively impacting patient safety and does not predict success in the future. Her insight into her deficiencies has been very poor throughout. She does not seem to have insight into the fact that her patient care and medical knowledge deficits pose significant patient safety issues. Regrettably this was confirmed by the 12/24/16 near miss and her failure to even understand her error.

We have the ultimate responsibility to all patients our residents treat while in our program and all those they treat upon graduation, to ensure their safety and wellbeing. MBC does not have the knowledge and skills to provide safe and effective patient care.

Thank you for your time,

Erica Richards[?]

―――――――――――――――――――――――――――――

Probation Meeting:

Brad DeVries (BD) and I met with Marybeth (MB) as planned on Tuesday afternoon 12/20/2016 at 3:30p. That meeting lasted until just after 5p.

Summary:

I congratulated Marybeth on her ongoing hard work and positive attitude. Informed her that the CCC was pleased with some slight improvement seen on the ambulatory side. The CCC did recommend she remain Under Review for these ambulatory deficiencies. Marybeth mentioned that Dr. Davidian gave her high scores on her Women's Health evaluation. I did share with her that he consistently inflates evaluation scores with residents he works with and we have ongoing faculty development planned for him and all attendings with similar grading patterns.

The CCC did recommend Probation for Marybeth due to ongoing inpatient deficiencies, specifically outlined in the Probation letter we reviewed together. I shared with her that feedback was provided by her [...] supervisors, attendings as well as nursing (provided to me indirectly) on Night Float and PICU [...] had not completed at the time of our meeting.

2

- [text largely illegible]
- [text largely illegible regarding management of common inpatient conditions, admissions, patient safety, signing incorrect progress notes, etc.]
- MB has a weak medical knowledge base. She later asked if there is any hope that she can improve her PMK performance... I shared with her that my assessment from [rotations] is that her level of medical knowledge and patient care skills are extremely low. These are foundational and because her foundation is so weak, she is not progressing as expected with each block. We reviewed her inability to recognize an abnormal urinalysis in July in the setting of a UTI in walk-in clinic. That's an example of medical knowledge a medical student has that should be retained and her excuse that she was off 5 months after does not hold up. I told her that I had expected her to **make significant improvements from Block 4 Night Float to Block 6 MKS** and because her first week was so poor and she's had only occasional good performances since, that I don't anticipate she'll be able to achieve the outcomes necessary for her to meet expectations we will have for all of our interns by March 8, 2017. However, the CCC, including me, want to offer her the **opportunity to proceed through the next step if she wishes to continue on.** We urged her to talk with Dr. Porter and GME if she has questions about alternative career options. I was unable to answer her question about whether she can do a Family Medicine residency instead because I'm not fully aware of how funding would work. She asked what the next step would be if she does not meet the expectations outlined in the probation document. We shared with her that, unless some egregious patient safety issue(s) arise, she could potentially complete her year with us. If the CCC determines she has not met competencies to progress to the PGY2 year, her contract would not be renewed because it would be her second time repeating the PGY1 year. GME contracts do not allow repeating the PGY 1 more than once.
- MB admitted that she sees herself in outpatient medicine after graduation. She does not like inpatient medicine, especially the brisk and demanding pace. She says she's not happy with it and isn't sure she wants to continue on with it. Our response was that Internal Medicine training includes inpatient and ambulatory competencies and the CCC is obligated to ensure our residents graduate with all or nearly all of them met, as we cannot predict how graduating residents use their training.
- MB argued that she is reviewing **electrolytes, obtaining EKGs in chest pain patients** etc. I shared with her that the delays and need for ongoing continuous supervision for tasks such as these **to be completed are the ultimate concern.** We expect an intern to get an EKG immediately upon seeing a patient with possible cardiac ischemia. Waiting to be reminded by the supervisor 1 hour later can make a difference in an acute myocardium. I did not get the impression she agreed nor understood the importance of timing despite my efforts to discuss this in detail.
- At one point MB wanted to discuss "last year", when we "terminated her". I reminded her that we did not terminate her. I did let her know that this type of discussion would require GME and others involvement because I, the new program director at that point, was not privy to all the details. She pushed the issue further and I did comment that her having an attorney makes it important that such discussions as she was wanting should take place with proper counsel around me.