IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARY E. CANNING,<br><br>     Plaintiff,<br><br>vs.<br><br>CREIGHTON UNIVERSITY,<br><br>     Defendant. | 4:18-CV-3023<br><br>MEMORANDUM AND ORDER |

The plaintiff, Dr. Mary Elizabeth (Mary Beth) Canning, alleges in her amended complaint claims of discrimination based on age pursuant to 29 U.S.C. § 623(a)(1) and Neb. Rev. Stat. § 48-1004, disability pursuant to 42 U.S.C. § 12112(a) and Neb. Rev. Stat. § 48-1104(1), national origin pursuant to 42 U.S.C. § 2000e-2(a)(1) and Neb. Rev. Stat. § 48-1104(1), and retaliation pursuant to 42 U.S.C. § 12203(a) and Neb. Rev. Stat. § 48-1114. Filing 21. The defendant, Creighton University, has moved for summary judgment regarding all claims. Filing 45. The Court will grant the defendant's motion and dismiss the plaintiff's amended complaint.

## I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## II. BACKGROUND

The plaintiff graduated from Vassar College with a Bachelor of Arts in philosophy in 1979. In 1981, she earned a master's degree in accounting from Bentley College in Waltham, Massachusetts. Filing 46-1 at 3. After graduating from Bentley, she worked as a credit analyst at Depositors Trust Company in Augusta, Maine, and continued working in the financial services industry for a variety of employers for around twelve years. In 1993, the plaintiff joined her family's business, a wholesale distributor for convenience stores. After five years in the family business, and now in her late thirties, the plaintiff decided to go back to school. In 2003, the plaintiff earned a Bachelor of Science in biology from the University of Southern Maine. Filing 46-1 at 3-4. She next attended medical school in Ireland at University College Dublin, graduating in 2008. Filing 46-1 at 3. After earning her medical degree, the plaintiff experienced a period of personal and family ill health. In 2011, she resumed her medical studies with Kaplan Medical in Chicago, where she prepared for

the first two of the three required step examinations that she had to pass before she could be accepted into a residency program. Filing 46-1 at 5. In 2013 the plaintiff participated in a hospital-based program (but not a residency program) at Drexel University Hahnemann Hospital in Philadelphia. This program was for physicians who were from foreign medical schools or who had been out of practice for a period of time. Filing 46-1 at 3, 5-6.

The plaintiff was accepted into Creighton's residency program in 2014. Filing 46-1 at 7. It was her second attempt at obtaining placement in a residency program. Prior to her acceptance, the plaintiff interviewed with Drs. Erica Cichowski, Carrie Valenta and Eric Peters in December 2014, and began her responsibilities as a first-year internal medicine resident on July 1, 2015. Filing 46-1 at 8-9. The plaintiff was now a fifty-seven-year-old first-year internal medicine resident. Filing 21 at 1-2.

An in-service examination is given to all residents in July. Filing 46-1 at 34-35, filing 46-15 at 4. The plaintiff scored in the lowest 15 percent in the country. In November 2015, a supervising resident reported to Program Director Dr. Tammy Wichman that the plaintiff was struggling. Filing 46-1 at 12. The plaintiff met with Dr. Wichman and Dr. Bradley DeVrieze, and admitted that she was feeling overwhelmed trying to complete her duties. Filing 46-1 at 12-13. In December Dr. Jason Lambrecht evaluated the plaintiff's performance and expressed concerns about her basic skills and level of competence. Filing 46-1 at 11. The concern with the plaintiff's level of competence was generally attributed to her perceived limitations with memory. A third-year supervising resident made a joke on one occasion concerning the plaintiff's memory lapse, calling it dementia. Filing 46-1 at 15. Although the plaintiff understood the comment to be a joke (filing 46-1 at 16), she nonetheless found the comment to be demeaning. Filing 53-9 at 51.

First-year residents train under the direct supervision of physicians at hospitals and clinics affiliated with the defendant. Filing 46-15 at 2. The residents are evaluated by the faculty physicians, usually every four weeks. Filing 46-15 at 3. The Clinical Competency Committee is responsible for overseeing the evaluation process and the resident's progress. Relevant members of the Committee for the purposes of this matter included Dr. Cichowski, Dr. DeVrieze, Dr. Wichman, and Dr. Theresa Townley. On December 18, 2015, the Committee met to review the progress of all residents in the program. Filing 46-3 at 1. The Committee determined that the plaintiff had not progressed in several areas such that she could transition to the next level of training. In a letter dated January 22, 2016 the plaintiff was advised that she would be required to repeat her first year of training under the direct supervision of Dr. Townley. The letter outlined several deficiencies and the expected milestones that the plaintiff must achieve in order to progress to the next level.

The plaintiff met with Drs. Wichman, DeVrieze, and Cichowski on January 22 to discuss the Committee's decision to have her repeat the first year. Filing 46-1 at 12. The plaintiff agreed with the Committee's decision and felt that it would be beneficial for her to repeat the first year. Filing 46-1 at 13-14. The plaintiff said that there was a discussion on what could be done to help her learn, and that Dr. Cichowski asked her if she would be willing to meet with a psychologist, Dr. Geoffrey Anderson. Filing 46-1 at 16, filing 46-15 at 4-5. The plaintiff believed that Dr. Anderson would be like a learning skills coach. Filing 46-1 at 16. Dr. Anderson contacted the plaintiff by email on February 9, reporting that he had been contacted by the Committee to meet with her and facilitate a plan of remediation for her when she repeats her first-

year residency program. Dr. Anderson asked the plaintiff to schedule a time to meet. Filing 46-4.

The plaintiff asked Dr. Cichowski to be her faculty mentor, and Dr. Cichowski agreed. They would meet or have telephone conferences regularly. On February 12, Dr. DeVrieze told the plaintiff that he would be attending her meeting with Dr. Cichowski set for later that day. Filing 46-1 at 16. Dr. Cichowski's documentation of that meeting indicates that she and Dr. DeVrieze told the plaintiff that they had grave concerns that her knowledge and experience gap may be too large to overcome. Filing 46-15 at 7. The plaintiff was told that the chief residents have been expressing concerns about her performance since August 2015. The plaintiff said that in this meeting Dr. DeVrieze asked her if she had a memory problem, and said that Dr. Lambrecht had mentioned something about the plaintiff's memory issues. Filing 46-1 at 16. Dr. DeVrieze also asked the plaintiff if she had met with Dr. Anderson yet.

On February 13, the day after her meeting with Dr. DeVrieze, the plaintiff responded to Dr. Anderson's February 9 email. Filing 46-4. The plaintiff then had her meeting with Dr. Anderson on February 16. The plaintiff said that after introducing himself, Dr. Anderson told her that he was going to develop a plan for her to learn certain things that she needed to learn. Filing 46-1 at 18. Dr. Anderson brought up neurocognitive testing. The plaintiff asked, "what if the testing came up negative?" According to the plaintiff, Dr. Anderson said, "well, we're going to keep testing you." The plaintiff said that Dr. Anderson started a line of persistent questioning about how she understood the difficulties that she was having. The plaintiff indicated that Dr. Anderson's questioning frustrated and flustered her. According to the plaintiff, near the end of the meeting Dr. Anderson told her, "you don't understand what they are trying to do to you." Filing 46-1 at 18.

Dr. Anderson documented his meeting with the plaintiff in a brief note in which he expressed his and the Committee's concerns. Filing 53-8 at 5. He reported that there were concerns about the plaintiff's capacity to learn and retain complex and abstract information, and whether this problem was due to an organic cause such as dementia, or a functional cause such as anxiety or substance abuse. Dr. Anderson noted several deficiencies in the plaintiff's knowledge base such as the basic hospital infrastructure, use of the computer system, and the ability to synthesize facts and data so as to diagnose a condition and formulate a care plan. Dr. Anderson acknowledged that the plaintiff did not report any unusual stressors, but that she felt overwhelmed much of the time. Dr. Anderson concluded that there was reason to be concerned that the plaintiff could make a critical error in patient care leading to injury or death. Filing 53-8 at 5.

On February 18, the plaintiff met with Dr. Cichowski and Dr. Joann Porter, the Associate Dean of Graduate Medical Education. Filing 46-15 at 5. Dr. Cichowski informed the plaintiff that the Committee had made two further decisions regarding her residency. Filing 46-15 at 8. First, the plaintiff was to be put on a leave of absence with pay until a fitness-for-duty evaluation deemed her safe for patient care. The evaluation was to be scheduled as soon as possible and if she were deemed fit, she could return to finish her first year and receive credit. The plaintiff said that Dr. Porter compared this fitness evaluation to the kind of evaluations that pilots undergo. Filing 46-1 at 19, 42-43. Second, the Committee decided that instead of having the plaintiff repeat the first year, it was in her best interests that her contract to remain in the program not be renewed. Dr. Cichowski explained that these two decisions were separate issues. Even if the plaintiff were deemed fit for duty, she would not be eligible for the renewal of her contract. The decision to not renew her contract was

based on the plaintiff's inability to progress in terms of skill and competency during her first year. At the end of the meeting, the plaintiff was given a letter confirming that her contract would not be renewed. Filing 46-7. She was also advised that she had a right to appeal the non-renewal decision, and was given copies of the defendant's Corrective Action Policy and Resident Due Process Policy. Filing 46-15 at 8.

On February 26, the plaintiff emailed Dr. Anderson to request a copy of the record or assessment that he had made of their meeting. Filing 46-5. Dr. Anderson responded that same day, advising the plaintiff that their February 16 meeting was not an evaluation or assessment. Filing 46-6. Instead, the meeting, according to Dr. Anderson, was to determine how the plaintiff understood the learning difficulties she was experiencing and if there was a need for a fitness-for-duty evaluation. Dr. Anderson felt a referral for a clinical evaluation of possible cognitive impairments would be beneficial. He also emphasized again what the plaintiff was told in the February 18 meeting— that any fitness-for-duty evaluation would not change the decision to not renew her contract. Filing 46-6.

The plaintiff filed a grievance, dated February 27, 2016, addressed to Dr. Porter. Filing 46-9. The grievance focused on the plaintiff's interactions with the third-year supervising resident, a native of India, who had made the joke about the plaintiff's dementia. The plaintiff described several disagreements, both personal and professional, she had with this supervising resident, and how she had to deal with his several mistruths. Filing 46-9.

In a letter dated March 7 and addressed to Dr. Cichowski, attorney Edward F. Pohren advised that he was consulting with the plaintiff regarding the actions of February 18. Filing 53-9 at 22-25. Pohren was critical of the plaintiff's meeting with Dr. Anderson, and characterized the meeting as an

unconsented-to mental health evaluation or assessment. Pohren repeated the several deficiencies that Dr. Anderson noted in his report, and argued that by relieving the plaintiff of her duties, the defendant had violated the plaintiff's rights pursuant to the Americans with Disabilities Act (ADA), in that the plaintiff was being regarded as a person with an impairment involving mental health. Pohren objected to the fitness-for-duty evaluation that had been scheduled with Dr. Ty Callahan, arguing that the evaluation was contrary to the protections found in the ADA. Pohren requested that the defendant rescind all of the adverse actions taken on February 18 without the need for an appeal hearing or further process.

In an April 6 letter, the defendant's general counsel, James Jansen, acknowledged speaking with Pohren, and proposed a resolution to the plaintiff's situation. Filing 53-9 at 44. In pertinent part, Jansen's proposal called for the plaintiff to submit to a fit-for-duty evaluation arranged by the defendant, and if the plaintiff was cleared for duty, she would be permitted to repeat her first-year residency in the defendant's internal medicine program. Pohren responded in a letter dated April 14, and advised Jansen that the plaintiff had undergone a full wellness examination with a specific request to look for dementia issues, and was tested by a neuropsychologist for neurocognitive deficits or a psychological disorder that would interfere with her competency. Filing 53-9 at 46. He reported that the testing ruled out any kind of disorder, and that he would be willing to share these results if the plaintiff were reinstated to full-time duty and permitted to repeat her first year of residency. The neuropsychologist who evaluated the plaintiff was Colleen Connolly. Filing 46-1 at 23.

Although Pohren's letter did not specifically address Jansen's proposal for a fitness evaluation by Dr. Callahan, the plaintiff was evaluated by Dr.

Callahan on May 27. Filing 53-8 at 12-15. Dr. Callahan's report, dated June 7, indicates that the plaintiff brought a copy of Dr. Connolly's report with her to the evaluation, which Dr. Callahan reviewed along with the defendant's referral request. Dr. Callahan reported that his examination and testing lasted for about five and a half hours. His conclusion was that he did not find any evidence of a medical or psychiatric condition compared to peers similar in age, gender, and education. Filing 53-8 at 14. Dr. Callahan did, however, conclude that the plaintiff likely experienced mild limitations in synthesizing pieces of information into a coherent whole, in making complex decisions, and with respect to the level of abstract reasoning expected of a first-year resident. Filing 53-8 at 14.

A special meeting of the Clinical Competency Committee was held on June 15, 2016. Creighton's Associate General Counsel Andrea Jahn announced to the attendees that the plaintiff will return to the program effective July 1 to repeat her first year of residency. Filing 53-8 at 17. A report of the meeting prepared by program administrator Julie Nelson, indicates that the plaintiff was aware that she was on a verbal performance improvement plan. Nelson's report also outlined certain measures the core faculty members were to follow with respect to the plaintiff's return, including a reminder that all evaluations must be performance-based with objective language only. The plaintiff claims that she was not told she was on a performance improvement plan. Filing 46-1 at 35-36, filing 53-9 at 56.

When asked if she was enthusiastic about getting back into the residency program, the plaintiff responded that she was very enthusiastic. The plaintiff was required to take the same in-service examination she took the year before, and this time her score was even worse, scoring in the seventh percentile. Filing 46-1 at 35, filing 46-15 at 5. Notes from attending physicians indicate

that the plaintiff continued to struggle with her fund of medical knowledge, the completion of assessments, and development of care plans. A note dated September 16, 2016, by Dr. Nathan Birch reported that the plaintiff cared very deeply about the people she sees, but her organizational and knowledge base were concerning. Dr. Birch reported that in July and August, the plaintiff had difficulties with distinguishing shoulder and back pain, the diagnosis of skin conditions, and developing care plans for other conditions. Filing 46-11 at 9. On July 22, Dr. Carolyn Manhart reported that the plaintiff needed supervision in taking all the information that she had gathered and coming up with a specific plan of action, but that her bedside manner and communication skills were very good. Filing 46-11 at 8. In a note dated August 26, Dr. Mahmoud Abu Hazeem reported that the plaintiff had a positive attitude, was hard working, and had a good rapport with patients, but overall her competency level was below her peer averages, and that she required more supervision and assistance to finish her duties. Filing 46-11 at 6.

On September 23, the plaintiff was notified that the Clinical Competency Committee had met on September 14 to review her evaluations since beginning the current academic year, and that based on those reports, the Committee decided to place her on under-review status. Filing 46-12. The notice identified nine separate deficiencies that led to the Committee's decision, what the plaintiff would be required to do to correct the deficiencies, and the improvements that the Committee expected to see by November 20. The notice also advised the plaintiff that if an incident occurred during the under-review period that was grounds for probation or termination, she could be placed on probation or terminated immediately. Filing 46-12 at 3. On December 20, the plaintiff was notified that she was being placed on probation status. Filing 46-13. This notification, again, detailed the deficiencies leading to her

probationary status, including specific incidents of deficiencies as reported by attending physicians. The notification also advised the plaintiff about the specific steps that must be taken to correct her deficiencies.

In a document dated January 3, 2017, the plaintiff was notified that the Committee had recommended her dismissal from the residency program. Filing 46-14. The reason for her dismissal stemmed from what was described as "a significant patient safety near miss," which occurred due to the plaintiff's error of omission despite direct supervision from her supervisor and attending physician. Filing 46-14 at 1. The patient safety incident involved the plaintiff's failure to discharge a patient with a history of chronic pulmonary embolism on the proper anticoagulant agent after the patient had failed the Coumadin she had been on. Filing 46-14 at 1; filing 53-9 at 16; filing 53-9 at 18-19. Fortunately, the plaintiff's error was caught by a nurse and corrected before the patient was actually discharged.

The plaintiff disagrees with the evaluations she was given, and disputes the accuracy of the accounts of the deficiencies attributed to her work, as well as the accuracy of the alleged patient safety incident report. *See* filing 53-9 at 56-59. After her termination, some attending physicians submitted letters supporting the plaintiff. Filing 53-8 at 34, 36, 38. The plaintiff asserts that she was treated differently from the other first-year residents when she returned to the program in July 2016. Filing 46-1 at 33-34. The plaintiff also alleges that Dr. Cichowski and others did not follow the relevant policies with respect to the disciplinary measures imposed in 2016 and with respect to her termination from the program in January 2017. Filing 53-9 at 57-60.

## III. DISCUSSION

### 1. AGE DISCRIMINATION[1]

The Age Discrimination in Employment Act prohibits discrimination against employees that are at least 40 years of age. 29 U.S.C. §§ 623(a) & 631(a). The plaintiff's prima facie case requires proof that she: (1) was at least 40 years old, (2) she met the applicable job qualifications, (3) she suffered an adverse employment action, and (4) there is some additional evidence that age was a factor in the termination decision. *Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 800 (8th Cir. 2014). To establish a claim of age discrimination, the plaintiff must prove by a preponderance of the evidence, which may be direct or circumstantial, that age was the but-for cause of the challenged employer decision. *Id.* Here, the employer decision that the plaintiff challenges is her termination from the defendant's postgraduate medical education program. See filing 52 at 42, filing 21 at 9.

Direct evidence is evidence indicating a specific link between the asserted discriminatory intent and the adverse employment action sufficient to support a finding by a reasonable fact finder that a discriminatory intent actually motivated the adverse employment action. *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). The plaintiff's argument regarding direct evidence of age discrimination focuses on the comment by the third-year resident joking that the plaintiff had dementia, and the several comments by attending physicians regarding the plaintiff's slow pace of completing her assigned duties. Filing 52 at 42.

---

[1] Age discrimination claims under the Nebraska Fair Employment Practices Act and Title VII share a common analysis. *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 777 n.3 (8th Cir. 2012).

The dementia comment, even though all agree it was intended as an ill-advised joke, and to the extent dementia directly implicates age, was at best a stray remark made by a non-decisionmaker. But, stray remarks, statements by non-decisionmakers, and decisionmaker statements unrelated to the decisional process do not constitute direct evidence. *Id.* Even if the dementia comment would reflect an age animus, there is no evidence that a member of the Clinical Competency Committee, in any way, factored the dementia comment into the decision to terminate the plaintiff from the program. When asked to identify how she was a victim of age discrimination, the plaintiff said that age was a factor in the March 2016 decision to not renew her contract. Filing 46-1 at 42-43. However, the decision to terminate the plaintiff from the program occurred in January 2017, in response to the report of an error affecting patient safety. Filing 46-14. Even if age was somehow a factor in the contract non-renewal decision, it was not a factor in the termination decision made several months later. As such, there is no direct but-for causation between the claimed evidence of age discrimination, and the adverse employment decision. Also, although there is evidence that the plaintiff's slow pace at completing her assigned duties was a factor in placing her under review and on probation, there is no direct evidence the plaintiff's pace motivated her termination from the program.

In the absence of direct evidence of age discrimination, the plaintiff may present evidence that creates an inference of discrimination under the *McDonnell Douglas* burden-shifting framework. *Tramp,* 768 F.3d at 800. Under this framework, the plaintiff first must establish a prima facie case of age discrimination. Once a prima facie case is established, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for its adverse employment action. If the defendant does so, the plaintiff

must show that the defendant's proffered reason was a pretext. *Rahif v. Mo-Tech Corp.*, 642 F.3d 633, 637 (8th Cir. 2011).

The defendant argues that the plaintiff cannot establish a prima facie case because the plaintiff was not qualified to continue in the residency program. Filing 47 at 29-30. The defendant is ignoring that this is the defendant's motion for summary judgment, and the indirect evidence of a prima facie case is viewed in a light most favorable to the plaintiff. The burden of establishing a prima facie case of discrimination is not onerous. *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). A plaintiff need only show that he or she possesses the basic skills necessary to perform the job, not that he or she is doing the job satisfactorily. *McGinnis v. Union Pacific R.R.,* 496 F.3d 868, 874 n.2 (8th Cir. 2007).

Although the plaintiff received several evaluations that justified placing her under review, and subsequently on probation, there were also attending physicians who found the plaintiff's work to be satisfactory. For example, Dr. Peter Silberstein reported that the plaintiff's knowledge at the end of her rotation in hematology/oncology was acceptable for a first-year resident and that she was one of the better residents in terms of completing all assignments. Filing 53-8 at 7. Letters of support from Dr. Jennifer Green (filing 53-8 at 10), Dr. Carolyn Manhart (filing 53-8 at 34), Dr. Joleen Fixley (filing 53-8 at 36), and Dr. Timothy Griffin (filing 53-8 at 38) were equally positive regarding the plaintiff's work ethic, knowledge, and skills. Accordingly, there is evidence in the record that would allow a rational finder of fact to conclude that the plaintiff was qualified for placement in the defendant's residency program.

There is also evidence that would allow a rational fact finder to infer that age was a factor in the Committee's decision to terminate the plaintiff's residency. Contrary to the defendant's argument, the plaintiff adduced

evidence that she was treated differently from the other younger residents, all of whom were under the age of 40. For example, several doctors acknowledged that other younger residents were put under review for medical knowledge and other reasons, but were not terminated from the program. Filing 53-1 at 23-24. No other younger resident was required to submit to fitness-for-duty testing. Filing 53-2 at 11; filing 53-5 at 8-9. To their knowledge, no other younger resident was terminated for making an "error of omission"[2] on a patient discharge. Filing 53-2 at 29-30; filing 53-5 at 15. The burden of establishing a prima facie discrimination case is not onerous. To the extent that the plaintiff's allegations that she was treated differently from the younger residents are plausible, she has established her prima facie case of age discrimination.

Even assuming that the plaintiff has shown a prima facie case of age discrimination, the defendant has offered legitimate nondiscriminatory reasons for terminating the plaintiff from the defendant's residency program. The defendant has thoroughly documented the plaintiff's inadequate fund of medical knowledge, her substandard clinical skills, the inability to timely perform a first-year resident's duties, and the plaintiff's apparent lack of personal resolve to deal with the stress level a first-year internal medicine resident is expected to endure. The defendant's documentation indicates that the plaintiff's performance in the defendant's internal medicine residency program never progressed to the minimum standards expected of a first-year resident. See, filing 46-15 at 4-10. Whether an error of omission or a medical error, the defendant had a right—if not an obligation—to respond to an act or

---

[2] The parties dispute whether the error was one of omission or was a medical error, but for the purposes of summary judgment, the plaintiff's view that it was an error of omission will be adopted.

omission affecting patient safety with termination of the responsible individual.

The burden now shifts back to the plaintiff to show that the defendant's proffered reasons were a mere pretext for age discrimination. The plaintiff's pretext arguments point to the same evidence the plaintiff relied on for her prima facie case. It is possible for strong evidence of a prima facie case to also present a factual issue on pretext. *Ridout v. JBS USA, LLC,* 716 F.3d 1079, 1083 (8th Cir. 2013). This is particularly true when the employer claims that an employee was terminated for unsatisfactory performance. A strong showing that the plaintiff was meeting the employer's reasonable expectations prior to, or at the time of termination may create a fact issue as to pretext for the adverse employment action. *Id.* at 1084.

Here, however, no rational fact finder could conclude that the plaintiff had ever, at any time, met the defendant's reasonable expectations for a first-year internal medicine resident. From the beginning of her residency, the plaintiff failed to perform up to the program's expectations. Her initial testing showed her to be in the lowest 15 percent of her peers. Filing 46-15 at 4. She was consistently reported to have knowledge deficiencies and required much more assistance and supervision than did her peers. The Clinical Competency Committee, charged with overseeing the evaluation of the program's medical residents according to national standards, consistently found that the plaintiff's performance did not meet the expectations for a first-year internal medicine resident. Filing 46-15 at 3.

Long before the error that resulted in the plaintiff's termination from the program, the Committee determined that the plaintiff's deficiencies made it necessary for her to repeat her first year of residency, but then later determined that instead, she should simply be let go from the program at the

end of her current first year. Filing 46-15 at 8. Intervention by the plaintiff's legal representative resulted in the Committee reversing itself and allow the plaintiff to repeat her first year. However, the plaintiff again severely underperformed on the required testing, and failed to meet the expectations of many of the attending physicians who were charged with evaluating her performance. But even with her long history of substandard performance, the plaintiff was not discharged until she committed an error that directly affected patient safety. Filing 46-15 at 9-10. Given the extensive record of the plaintiff's deficiencies, no rational fact finder could conclude that the plaintiff's termination from the program due to concerns for patient safety was pretextual, and that age was actually the determinative factor in the decision. See *Rahif*, 642 F.3d at 638.

The same is true for the plaintiff's claim that she was treated differently from the younger residents. The plaintiff argues that other younger medical residents placed under review were given more favorable treatment such as coaching and preparation in how to overcome the difficulties they were having, and that no other younger resident was singled out for psychological testing. Filing 52 at 42. The plaintiff's argument boils down to a similarly situated co-worker inquiry, which requires a showing that the plaintiff was treated differently from other younger medical residents whose deficiencies were of comparable seriousness. *Ridout*, 716 F.3d at 1085. The plaintiff's argument overlooks the reason she was terminated from the program. She was terminated for a serious error affecting patient safety. She was not terminated for her substandard participation in the residency program. For that, she was asked to repeat her first year, placed on under-review status, and placed on probation. The other residents that the plaintiff claims were treated more

favorably were not responsible for a serious error affecting patient safety. The plaintiff is not comparing apples to apples.

There can be no age discrimination when the employer's decision is wholly motivated by factors other than age. *Tramp,* 768 F.3d at 801. Here, no rational fact finder could conclude that the defendant's decision to terminate the plaintiff from the internal medicine residency program was motivated by her age, and not motivated by concerns for patient safety. The defendant is entitled to summary judgment as to the plaintiff's age discrimination claim.

## 2. DISABILITY DISCRIMINATION[3]

The Americans with Disability Act makes it unlawful for the defendant to discriminate against its medical residents on the basis of a disability. 42 U.S.C. § 12112(a). A disability is defined as a physical or mental impairment that substantially limits one of more major life activities, and also includes being regarded as having such an impairment. 42 U.S.C. § 12102(2)(A) & (C). Major life activities are basic activities that the average person can perform with little or no difficulty, including caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i). The ability to perform cognitive functions on the level of an average person falls within this category of basic activities. *Brown v. Cox,* 286 F.3d 1040, 1045 (8th Cir. 2002). Thinking and concentrating qualify as major life activities under the ADA. *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 861 (8th Cir. 2006).

---

[3] Disability discrimination claims under the Nebraska Fair Employment Practices Act and Title VII share a common analysis. *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002).

The plaintiff asserts that there are genuine issues of material fact regarding whether she was regarded as learning-disabled. Filing 52 at 34-35. The evidence that the plaintiff argues supports her assertion is the fact that the defendant had the plaintiff's cognitive function covertly tested by Dr. Anderson, and then overtly tested by Dr. Callahan, as a condition for her return to the defendant's residency program. Assuming that both events were for the purpose of evaluating the plaintiff's cognitive function, neither resulted in a finding that the plaintiff was impaired. See filing 53-8 at 14-15. The defendant argues that after the plaintiff passed all cognitive evaluations there is no evidence, direct or indirect, that she was regarded as disabled, and no evidence that a perceived disability played any role in the patient error that led to her termination from the program. Filing 46 at 37-40.

The plaintiff's prima facie case required evidence that she was a disabled person, or regarded as disabled, within the meaning of the ADA, that she was qualified to perform the essential functions of an internal medicine resident, and that she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *Ryan*, 679 F.3d at 777. The Court is unable to find evidence that gives rise to an inference that the plaintiff was regarded as disabled at the time of the adverse employment action for which the plaintiff seeks damages. In fact, the evidence the plaintiff relies on, the two cognitive function evaluations, benefited the plaintiff in that the findings of no impairment allowed the plaintiff to resume participation in the defendant's residency program. There is an absence of evidence—and the plaintiff has not directed the Court to what she believes is evidence suggesting—that after her return to the program in July 2016, she was regarded as learning-disabled by a person in a position to affect the plaintiff's evaluations. Nor has the plaintiff directed the Court to evidence inferring that

the decision to place her under review, on probation, or terminate her from the defendant's residence program were due to a perceived learning disability.

Moreover, the Court is unable to conclude that what the plaintiff asserts is a disability . . . is, in fact, a disability within the meaning of the ADA. For a mental impairment to be disabling, it must substantially limit the ability to perform cognitive functions on the level of an average person in the general population. *Battle*, 438 F.3d at 861; *Brown*, 286 F.3d at 1045. The cognitive functions the plaintiff struggled with concerned the capacity to retain complex and abstract information. The concerns identified by Dr. Callahan were mild limitations in synthesizing pieces of medical information into a coherent whole, in making complex decisions, and in the level of abstract reasoning expected of a first-year resident. The Court has no difficulty concluding that the cognitive functioning required of a first-year internal medicine resident far exceeds that required of an average person in the general population. The plaintiff's inability to acquire the fund of medical knowledge necessary to succeed in the defendant's internal medicine residency program would not equate to being substantially cognitively limited on the level of an average person in the general population. No rational fact finder could conclude that the plaintiff was terminated due to a perceived disability.

### 3. RETALIATION

For a retaliation claim under the ADA and NFEPA, there must be either direct evidence of retaliation, or circumstantial evidence that results in an inference of retaliation when examined under the *McDonnell Douglas* burden-shifting framework. *Hustvet v. Allina Health System*, 910 F.3d 399, 412 (8th Cir. 2018). Under the burden-shifting framework, the plaintiff's evidence must demonstrate a prima facie case by showing three elements: (1) the plaintiff

engaged in protected activity; (2) the occurrence of an adverse employment action; and (3) a causal connection between the adverse action and the protected activity. *Id.* Under the ADA, the causal connection must be but-for causation—in other words, the protected activity must be the determining factor for the adverse employment action. *Univ. Of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 346-47 (2013); *Hustvet, supra.* It is unclear whether a causal connection under the NFEPA requires but-for causation, or only requires the protected activity to be a motivating factor for the adverse employment action. See *Ludlow v. BNSF Ry. Co.,* 788 F.3d 794, 802 (8th Cir. 2015).

Neither party argues that there is direct evidence of retaliation causing the plaintiff's termination from the residency program. The Court is also unable to find direct evidence of retaliation in its review of the evidence. With regard to the burden-shifting analysis, the defendant concedes that the plaintiff engaged in protected activity when in March 2016, her lawyer sent a letter to Dr. Cichowski, in her position as the Director of the defendant's Internal Medicine Residency Training Program (filing 46-8), complaining that the defendant was in violation of the ADA. The defendant also concedes that the plaintiff's termination from the program in January 2017 (filing 46-14), was an adverse employment action. Filing 47 at 51. The defendant does not concede that there is a causal connection of any kind between these two occurrences.

The plaintiff argues that indirect evidence of retaliation, sufficient to establish the requisite causal link, is found in the scrutiny that she was under after returning to the defendant's program to repeat her first-year residency. Filing 52 at 25, 30-31. The plaintiff also asserts that after her return to the program, various supervising physicians retaliated against her by acting to

frustrate her learning experience, and by purposefully misrepresenting and causing others to misrepresent her performance. Filing 52 at 25-26, 30-31. Regarding her termination in January 2017, the plaintiff implies that her termination was actually retaliation for her March 2016 complaint of ADA violations because the defendant's justifications for her termination were not accurate or truthful, that other doctors make drug prescription errors, the error she made was one of omission and not medical knowledge, and the patient was not actually harmed. Filing 52 at 31.

The Court finds that no rational juror could conclude that the letter from the plaintiff's lawyer in March 2016, asserting that the defendant violated the ADA, was a determining or motivating factor for the plaintiff's termination from the defendant's program in January 2017. "Although not dispositive, the time lapse between an employee's protected activity and the employer's adverse action is an important factor when evaluating whether a causal connection has been established." *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1003 (8th Cir. 2005). In *McBurney*, a six-month interval between the plaintiff return from FLMA leave and the employer's adverse action did not establish a sufficient causal link. In *Kipp v. Missouri Highway and Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002), two months between the filing of a discrimination complaint and the termination of employment could not justify a finding of a causal link. In *Van Horn v. Best Buy Stores, L.P.,* 526 F.3d 1144, 1149 (8th Cir. 2008), an eight-month interval between the plaintiff's complaint about a sexually offensive remark by a sales manager and the termination of her employment was insufficient to find that the complaint was a determinative factor in the decision to discharge the plaintiff. Finally, in *Smith v. Allen Health System, Inc.*, 302 F.3d 827, 833 (8th Cir. 2002), a two-week interval between the plaintiff's family leave and the employer's adverse action

was "sufficient, but barely so, to establish causation." Here, nearly ten months passed between the plaintiff's protected activity on March 7, 2016, and the defendant's adverse employment action on January 3, 2017. This lapse of time is far outside the temporal range typically allowed to support a finding of causation.

Additionally, the plaintiff has only speculated that the treatment she believes she endured after March 7 was retaliatory. She has not suggested a possible reason why the defendant would be motivated by the March 7 letter to terminate her from the program ten months later, or continually misrepresent her progress. The plaintiff's argument that her evaluations after March 7 are not to be believed is refuted by the fact that the plaintiff's evaluations prior to March 7 also documented her lack of medical knowledge and skill, and her several performance deficiencies. The reports of her insufficient fund of medical knowledge and level of skill after March 7 are no different than the reports of the plaintiff's competency, or lack thereof, that predate her protected activity.

Also, the disability discrimination complaint alleged in the March 7 letter was settled in the dialogue that ensued between Creighton's legal department and the plaintiff's lawyer. A resolution was reached whereby the plaintiff agreed to submit to testing to determine her fitness for duty, and if all was well, the defendant agreed to allow the plaintiff to repeat her first-year residency training. Implicit in the plaintiff's argument is that the defendant retained a lingering resentment over the fact that the plaintiff had complained that the defendant was violating the ADA. There is no evidence giving rise to a reasonable inference that once the plaintiff's March 7 complaint was settled, the defendant had any reason to retaliate against the plaintiff. The plaintiff's speculative guess does not suffice as evidence of causation.

Finally, the justification for terminating the plaintiff's employment due to a serious error in a patient's care was legitimate and plainly unrelated to the March 7 letter complaining that the defendant violated the ADA. The Court finds that there is a complete absence of evidence giving rise to a reasonable inference that the March 7 complaint that the defendant was violating the ADA was a motivating or determinative factor in her termination from the defendant's internal medicine residency program.

### 4.    NATIONAL ORIGIN DISCRIMINATION

The plaintiff, in her brief, agreed that her claim for national origin discrimination may be dismissed. Filing 52 at 1.

## III.    CONCLUSION

The Court concludes that there is insufficient evidence upon which a jury could conceivably find for the plaintiff on any of her claims. Accordingly, the Court finds that Creighton University's motion for summary judgment should be granted regarding all claims in Dr. Canning's amended complaint.

IT IS ORDERED:

1.    Defendant's motion for summary judgment (filing 45) is granted.

2.    Plaintiff's complaint is dismissed.

3.    A separate judgment will be entered.


Dated this 25th day of September, 2019.

                              BY THE COURT:

                              John M. Gerrard
                              Chief United States District Judge